1               UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF NEW YORK

2

3  -------------------------------X
                           :

4  SUNHONG YIM, et al.,       :
                           :  14-CV-5883 (WFK)

5          Plaintiffs,     :
                           :

6       v.               :
                           :  225 Cadman Plaza East

7  CAREY LIMOUSINE NY, INC., et al.,:  Brooklyn, New York
                           :

8          Defendants.     :  November 20, 2015
  -------------------------------X

9

10        TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
          BEFORE THE HONORABLE JAMES ORENSTEIN
11             UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13  For the Plaintiffs:       BRYAN SCHWARTZ, ESQ.
                       Bryan Schwartz Law
14                       1330 Broadway, Suite 1630
                       Oakland, California 94612

15                       WILLIAM RAND, ESQ.
                       Law Office of William Coudert Rand
16                       488 Madison avenue
                       New York, New York 10022

17

18  For the Defendants:       ANN-MARIE ESTEVEZ, ESQ.
                       SHARON LISITZKY, ESQ.
19                       Morgan Lewis & Bockius LLP
                       200 South Biscayne Boulevard
20                       Miami, Florida 33131

21

22  Court Transcriber:        SHARI RIEMER, CET-805
                       Typewrite Word Processing Service
23                       211 N. Milton Road
                       Saratoga Springs, New York 12866

24

25

Proceedings recorded by electronic sound recording, transcript
produced by transcription service

2

1  (Proceedings began at 11:31 a.m.)

2        THE CLERK: Civil Cause for [inaudible], <u>Yim v. Carey</u>

3  <u>Limousine NY, Inc., et al.</u>, Docket No. 14-CV-5883.

4        Counsel, please state your name for the record

5  starting with the plaintiff.

6        MR. SCHWARTZ:  Good morning, Your Honor.  Brian

7  Schwartz for plaintiffs Acuna, Olarte and the punitive class.

8        THE COURT: Good morning.

9        MR. RAND:  Good morning, Your Honor.  William Rand

10  for plaintiff Sunhong Yim.

11        THE COURT: Good morning.

12        MS. ESTEVEZ:  Anne-Marie Estevez and Sharon Lisitzky

13  on behalf of Carey.

14        THE COURT: Good morning.  All right, folks.  So

15  we've got the motion for preliminary approval.  I've read all

16  the papers you submitted.  So feel free to assume that I'm

17  familiar with those arguments and that you don't need to

18  restate them.

19        I'm happy to hear from all of you for or against the

20  motion.  I think what would be most useful for me to is to

21  start with you, Mr. Rand, because you're objecting to it and

22  I'll tell you that from my review of the -- of the submissions

23  so far my initial take -- I want you to know where I'm

24  starting from -- is that the proposed class action settlement

25  is within the realm of what can be approved and that

3

1  preliminary approval is therefore appropriate.  So I want to

2  give you a chance to be heard in opposition to it because I

3  think everyone else is for the position that I think is the

4  right one.

5            In doing that I want to make sure I understand your

6  opposition.  As I read your papers it's essentially your

7  client saying full recovery for me would be much greater than

8  I get under the proposed settlement and therefore it's not a

9  fair one and it's not fair for me or the other members of the

10  class.  Is that essentially it?

11            MR. RAND: Not full recovery.  Any reasonable

12  discount on recovery.  He's only getting $5,000.  If you look

13  at the papers -- I want to see the underlying facts to see

14  what the merits of this action are but he may have a claim for

15  $200,000.  So why would he settle for $5,000.

16            THE COURT: It's not just what his claim is, right,

17  it's a proposed class action, is this in the interest of the

18  class.

19            MR. RAND: But he's typical.

20            THE COURT: Well, first of all, does he have a

21  contract that has an arbitration clause?

22            MR. RAND: Yes.

23            THE COURT: One of the things that's been said in

24  support of the motion is that many, if not most of the members

25  of the class do and that that's an impediment to them

4

1  prevailing here, it's an impediment to class certification.

2  What do you say to that?

3          MR. RAND: That there's not that many of them,

4  there's over 100 people that do not have an arbitration

5  agreement.

6          THE COURT: How many of them do?

7          MR. RAND: Huh?

8          THE COURT: And how many do?

9          MR. RAND: I don't know.  I think it's 135.  Well,

10  there's plenty of people that have a class.  It's large enough

11  to have a class of people without an arbitration agreement.

12          THE COURT: All right.

13          MR. RAND: And there's no reason that the people who

14  are in this class should have their claim diluted by people

15  who may have a less great claim that happened without an

16  arbitration agreement.  So I would say those people are not

17  typical class members.

18          THE COURT: I see.  And what do you say about the

19  recent case law -- I guess two strands of cases.  Forgive me

20  for blanking on their names but one that's approved

21  settlements with comparably low percentages of recovery

22  compared to punitive full recovery and the other about cases

23  weighing in on the independent contractor relationship in this

24  industry.  It seems to me that there are some significant

25  risks to proceeding that your position just doesn't address.

1          MR. RAND: I don't think they're independent

2    contractors because they only work for one employer.  They

3    work 72 hours a week is the allegation.  They don't work for

4    anybody else.  They're told when to work, how to work and what

5    to do.

6          THE COURT: And you think this is going to be

7    uniform --

8          MR. RAND: I think there's a very low chance of

9    losing on that claim.

10          THE COURT: You think there's a very low chance but

11    there are cases that go the other way, aren't there?

12          MR. RAND: Well, I mean the FedEx cases but those are

13    different facts and some of them go our way and some don't.

14    So yes, I agree there may be some risk there but not enough to

15    settle for almost nothing.

16          THE COURT: I see.  Okay.  Anything else you want to

17    say?

18          MR. RAND:  Yes.  I have a number of --

19          THE COURT: Go ahead.

20          MR. RAND: In terms of the actual notice, I would

21    request that it include that Mr. [inaudible] made an objection

22    [inaudible] his attorney.  I would like to request that I can

23    send a notice out to all the people regarding this preliminary

24    approved settlement so I can give my views to the class so

25    they know there's some other viewpoint.

6

1          Also, I haven't been able to --

2          THE COURT: Have you submitted -- forgive me if I

3     missed it.  Have you submitted what -- a notice that had

4     proposed sent out?

5          MR. RAND: No, because I was waiting -- this is all

6     happening very fast for me.  I was only just hired at the end

7     of last week by my client.

8          THE COURT: I understand it's fast for you but it's

9     not fast for your client.  Why he's waited until the last

10    moment to secure counsel I don't know but -- and I understand

11    it happens sometimes that counsel find themself retained at

12    the last moment by the client who's waited way too long to get

13    counsel involved in the process but we've already waited for

14    your client to bring new counsel in.  So I'm not going to wait

15    further.

16         MR. RAND: Well --

17         THE COURT: If there's really no reason to -- there's

18    nothing to stop you in submitting your papers.

19         MR. RAND: This is a very -- nowhere in the papers --

20         THE COURT: Excuse me.  I wasn't finished speaking.

21         MR. RAND: Right.

22         THE COURT: There wasn't anything to stop you in

23    submitting your papers from saying here's what I'd like the

24    notice to say.  Has there been?

25         MR. RAND: I didn't have very much time.  I didn't

7

1   know what the position of the Court would be and you

2   haven't --

3            THE COURT: Because you didn't ask.

4            MR. RAND: You haven't even preliminarily approved

5   the notice.  I can ask for a second notice later.  There's no

6   rush on that, right?

7            THE COURT: I know but if you're saying this is

8   something you want me to consider, you knew that a proposed

9   notice was before me.  There was nothing stopping you from

10  doing it.  If you had an uncertainty you certainly could ask

11  but in any event you don't have a notice before me and if you

12  want something later obviously that can be asked for.

13           MR. RAND: I'm asking right now.  The notice would

14  say what I said in my papers.

15           THE COURT: Okay.

16           MR. RAND: And it would say you can contact me.

17           THE COURT: Well, I'm certainly not going to weigh in

18  on that without seeing a proposed --

19           MR. RAND: And I will submit a proposed notice on a

20  very quick basis if you would like it very quickly or you can

21  give me a reasonable time.  Whatever time frame is good for

22  you.

23           The other thing is the Court has a duty to make sure

24  that this recovery reflects the merits of the action.  I've

25  just joined this action and if you're not going to allow me to

8

1  delay the process on the preliminary approval I still need to

2  look at all the documents so I can comment on the final

3  approval.  Some of the documents were filed under seal in the

4  settlement.  So I haven't been able to see what the

5  independent contractor agreements are.  So I would ask that

6  counsel will agree to provide those to me.

7          Also, I would like to be provided with all the

8  discovery in this case, all of which is electronic so it

9  shouldn't be hard to produce to me.  I think there was one

10  deposition, a deposition transcript so that I can make an

11  intelligent argument to the Court as to what is fair or not

12  fair once I've looked at all these documents.

13          THE COURT: Does anyone wish to be heard?

14          MR. RAND: I have more, Your Honor.  I'm not

15  finished.

16          THE COURT: I'm sorry.

17          MR. RAND: I would also request a short period to put

18  in a formal brief in opposition to preliminary approval.  I

19  can get that done by Wednesday before Thanksgiving.

20          THE COURT: Well, I've already given you an

21  opportunity.  I'm not going to wait further.  And you've

22  submitted the declaration.

23          MR. RAND: Just deny my request, that's fine.  I made

24  it on the record.  That's fine.  And then I'll have a record.

25          THE COURT: If you'd like to tell me what I should

1  say in making a ruling you can but I'm going to say what I

2  think is appropriate.

3           MR. RAND: Okay.

4           THE COURT: Mr. Rand, you have had time.  Your client

5  has had even more time to secure counsel who would speak for

6  him.  But in the time that you've had you have submitted

7  something that reflects your views and you haven't given me

8  reason to think that you could submit a declaration but not a

9  brief.  So the request for more time before I make a

10 recommendation that's denied.

11          MR. RAND: Okay.  One of the arguments is that if you

12 have a class everybody has to be treated similarly in a

13 settlement.  You can't say some people get $10 million and

14 other people get $1.00.  Right?  That would not be a fair

15 settlement.

16          Here, they're basically saying if you sign the

17 operating agreement you get twice as much money as if you

18 don't sign the operating agreement.  That's not a reasonable

19 class action settlement and that's not fair under the law, and

20 if you gave me time I could provide a lot of law that will

21 show that and I will.

22          THE COURT: You keep saying if I give you time.  You

23 can say it as many times as you like but it won't change the

24 reality that I have given you and your client time.  We're at

25 a stage in the proceeding where I'm going to make a

10

1   recommendation but --

2           MR. RAND: I can make the briefs to the judge, you're

3   right.  I have three more days.

4           THE COURT:  -- you have had time.

5           MR. RAND: So that's fine.

6           THE COURT: I'm sorry.  What was the last -- I didn't

7   hear.

8           MR. RAND: Because if you make a recommendation then

9   I can appeal the recommendation to the judge; correct?

10          THE COURT: Right.  But not based on arguments that

11  you haven't made at this stage.

12          MR. RAND: Yes, but the legal arguments are --

13  factual arguments -- I mean it's just providing case law to

14  the Court for the arguments that I've already made.  That's

15  what I was requesting.

16          THE COURT: Okay.  There's been nothing to stop you

17  from submitting case law prior to now.  I just don't want you

18  to have any misimpressions about the level of review.  It is

19  de novo as to legal determinations but what's not permitted

20  typically is making legal arguments that haven't previously

21  been made in advance of the recommendation.

22          MR. RAND: I think that's about all I have at this

23  point.

24          THE COURT: Does anyone wish to be heard in response?

25          MR. SCHWARTZ: Thank you, Your Honor.  Your Honor's

1  tentative direction on this is the correct one, that at this

2  stage of the proceedings it's not the time -- not the moment

3  to consider objections.  We had in our papers a number of

4  cases that hold that -- for that proposition including In re:

5  Penthouse Executive Club Compensation Litigation and others.

6  I know you read the briefs carefully.  And as you know, this

7  is a deal that is within the range of possible approval.  So

8  it should be approved.

9          I do want to emphasize how -- because I think it's

10  one of the most important factors in preliminary approval is

11  the arm's length nature of the negotiations that we undertook.

12  We literally have something on the order of 1,000 emails going

13  back and forth negotiating every detail of this settlement and

14  I don't want to say contentious because it sounds like we were

15  rude to each other but there was very little we could agree on

16  at the outset and we really had to wade through a tremendous

17  amount of disagreement to ultimately get a deal that we were

18  able to feel -- that I was able to feel was satisfactory to

19  the class and that they could take to their client.

20          So it was extremely arm's length.  I don't know if

21  that makes sense, extremely arm's length, but very --

22          THE COURT: I get the --

23          MR. SCHWARTZ: Very long arms.  In any event, we

24  had -- it was very hotly debated to the point it was almost a

25  joke with us because it was -- I don't think I've ever had so

1  much intensive negotiation over a settlement agreement and the

2  reason is because -- and I think this is an important point.

3  We completely redrafted their business model as far as -- at

4  least as far as the way the contracts read four people like

5  Mr. Yim, that now he has extensive rights that he does not

6  have under his current agreement if he -- not just him but

7  if -- for class members that they're going to have under the

8  new deal, rights that are critical to day to day employment.

9  Things like the right to work for other people, the right

10  not -- the right to turn down jobs, the right to not be fired

11  except for good cause, the right to sell their company if you

12  will, their limo business to somebody else, and many others.

13          The old agreement that Mr. Yim has, and this is part

14  of what's flawed in some of the objections at the point where

15  Your Honor starts to consider them down the line is that his

16  old agreement which would be the basis for his claims gives

17  very little recourse to him.  It's a very one sided agreement

18  frankly and the new agreement -- now, Carey's position would

19  be that they never -- that they don't enforce it, it's very

20  individualized but notwithstanding that the document says what

21  it says and it's -- it doesn't give him much recourse at all.

22  Carey has unilateral right to change -- to change the

23  structure of it, to add charges for tips, sales, taxes,

24  service fees and we've changed that.  There's going to be

25  transparency.  So it's a very meaningful benefit of the deal

1  which is why ultimately I think it's a good deal in addition

2  to the significant monetary benefit.

3          Now, Mr. Rand, I don't know if he's unfamiliar with

4  the independent contractor cases that are really at issue

5  here.  He mentioned some FedEx cases.  Those, Your Honor, as

6  you know are not the cases that are most on point.  The cases

7  that are on point are the Saline case which is up at the

8  Second Circuit which will be -- oral argument will be heard in

9  February which is a case that Carey would have a decent

10 argument is very much like our case and in which the

11 plaintiffs got nothing.  They got zero.  They lost.  Summary

12 judgment against them.

13         So that made our case at the outset extremely risky

14 but I hoped that we would be able to distinguish that and if I

15 had to litigate the case rather than getting a fair result of

16 the class then I would seek to do so.  But other firms did not

17 forge ahead and the Outten & Golden firm which is frankly one

18 of my -- some of my finest colleagues in the [inaudible] here

19 in New York.

20         THE COURT: I didn't hear you what you said.  Which

21 firm?

22         MR. SCHWARTZ: The Outten & Golden firm.

23         THE COURT: Okay.

24         MR. SCHWARTZ: It's really an exceptional firm.  They

25 settled out the Anwar case for under a thousand bucks a person

14

1    based on the Saline case.  They saw the writing on the wall

2    and they decided to settle it out and I don't question them

3    for doing so and it was approved but for a class relatively

4    the same size as our class.  They got a gross of $360,000 and

5    we got $2.1 million.

6              So Mr. Yim's objections to the extent he decides

7    ultimately to assert them after the notice goes out need to be

8    viewed in that context but there is a very good chance that we

9    would lose altogether.

10             THE COURT: Can I ask a question about how the

11   agreement works.  To the extent you talked about changes to

12   Carey's practices in terms of contracting with the drivers,

13   what becomes of existing contracts with those who opt out of

14   the settlement if it's approved?

15             MR. SCHWARTZ: They keep them as long as Carey wants

16   to keep them.

17             THE COURT: So they have the same contract that he

18   complained about and they can continue obviously to --

19             MR. SCHWARTZ:  Right.

20             THE COURT:  -- litigate claims about them?

21             MR. SCHWARTZ: Right.  And that does raise a point I

22   wanted to make sure I addressed which is this idea that in a

23   class action that the whole class has to be -- receives the

24   same kind of relief or --

25             THE COURT: It's clearly not true.  I don't have

1  trouble with that.

2          MR. SCHWARTZ: Okay.  And ultimately when we decided

3  on an allocation it was based on what we felt were the

4  relative strengths of people's claims and also based on the

5  fact that we had put into place a very significant benefit

6  with this deal that we wanted people to take because that's

7  what the litigation is about.  If people take a bit of money

8  but then keep the same flawed deal that they had before it

9  doesn't really fix the problem that we filed the lawsuit

10 about.  So it helps, it gives them a little relief but I think

11 that the underlying changes in the structure of the business

12 are at least as if not more significant.

13          So when -- ultimately when Your Honor is evaluating

14 the settlement it should be in that context, the total value

15 of the settlement.

16          I certainly have a lot more I could say on a variety

17 of points but it seems like you -- I'm happy to address

18 anything.

19          THE COURT: Well, I want you to say anything that you

20 think is appropriate.  I just don't want you to feel compelled

21 to just restate things that are already in the papers.

22          MR. SCHWARTZ: Yes, Your Honor, naturally.

23          THE COURT: But if there's something that's not in

24 your papers that you think supports an argument or a response

25 to something Mr. Rand said I want you to have an opportunity

16

1   to do so.

2           MR. SCHWARTZ: Yes.  I mean I do want to address this

3   idea that somehow the notice should include the objectors or

4   objector's counsel.  I have never seen that.  I don't know

5   where that's coming from.  I don't know that there are any

6   precedents for that.  I certainly haven't seen any but I don't

7   think that's appropriate at all.  In fact, there's a recent

8   case I just read in the Eastern District where an objector's

9   counsel was chastised for trying to reach out and get people

10  to opt out and it's just that would be inappropriate.

11          The class -- and this is why preliminary approval

12  should happen.  We should go and see what the response to the

13  class is.  That is the most important factor ultimately under

14  the Granell factors and we'll see if others feel the way that

15  Mr. Yim apparently feels.  I suspect if others feel that

16  they're being cheated out of I believe all in Mr. Yim's claims

17  and his objection came out to something like $850,000 that if

18  he really feels that he's owed $850,000 then he should file

19  his own lawsuit.  I mean he should opt out of this because

20  there's no way that a class, a wage and hour class action is

21  going to provide that kind of relief ever.  It never has.

22          And others if they feel similarly won't participate

23  or will object and then you'll have an opportunity to observe

24  that at the -- in the final approval hearing.

25          THE COURT: Do you have a response to the request for

1  sharing the discovery that's already been provided?

2              MR. SCHWARTZ: I would defer to defendants on that.

3              THE COURT: I was going to say they have an interest

4  that's different from yours but to the extent that it's a

5  question for you and your clients is there any objection.

6              MR. SCHWARTZ: Only that we agreed as to some of it

7  and not all of it necessarily but as to some of it we agreed

8  that it was being exchanged for settlement purposes.  We had

9  initiated discovery and we decided to go into a mediation

10  framework.  We were given these documents in the context of

11  settlement and so we agreed that we would keep them

12  confidential, that they were being disclosed --

13              THE COURT: I understand.  Look, to the extent --

14              MR. SCHWARTZ: I'm just honoring the agreement.

15  That's all I'm saying.

16              THE COURT: Right.  But to the extent there's

17  information that your clients have provided I think there's no

18  objection to sharing it with Mr. Yim, new counsel.

19              MR. SCHWARTZ: I don't have an objection.  Mr. Yim

20  frankly has all of it.

21              THE COURT: Well, that's the thing.  He is a party

22  and a named party to the litigation and discovery has been

23  provided to him.  So to the extent that Mr. Rand is successor

24  counsel --

25              MR. SCHWARTZ: Yes, it's interesting.  I'm not

1  sure -- when I -- that may be, Your Honor, but the -- when you

2  asked us to brief that issue about the conflict and clearly

3  the case law suggests that my obligation is to the class with

4  the [inaudible] and Order case and the other cases that I

5  cited I wonder how that plays in with the discovery that was

6  produced that it was produced to me as counsel for this

7  punitive class, not to Mr. Yim sort of in his individual

8  capacity but as an agent of the representative class.

9          THE COURT: Some discovery certainly.

10         MR. RAND:  Mr. Yim is still a representative of the

11  class and is seeking to be a representative of the class.

12         THE COURT: He's seeking to be a representative of

13  the class.

14         MR. RAND:  There is no class yet.  So everybody is

15  seeking to be a representative of the class.  It's the same as

16  Mr. Schwartz's client.  He's in exactly the same position.

17         THE COURT: But prior to the proposed settlement

18  there had been significant discovery provided, no?

19         MR. RAND: Yes.

20         THE COURT: And it was provided to --

21         MR. SCHWARTZ: Well, it was provided -- so just to go

22  back a moment.  So we initiated discovery.  We deposed the CEO

23  and then we got into a mediation posture.  This is my

24  recollection.

25         THE COURT: Forgive me for interrupting.  Just so I

1   can state what's already on the record.

2            At the initial planning conference we deferred the

3   entry of a discovery schedule because you wanted to get

4   started on settlement discussions and that was on May 25th.

5   The settlement, at least in principle, a memorandum of

6   understanding I believe was about a month later.

7            MR. SCHWARTZ: Yes, Your Honor.

8            THE COURT: I'm sorry.  I interrupted you.

9            MR. SCHWARTZ: So the information that we were

10  ultimately provided I think it was in the context of mediation

11  because we had agreed to go to mediation and we went to

12  mediation in March.  So I think that the documents that were

13  exchanged were in that context but again I would defer to

14  defendants about how they feel about it.

15           MS. ESTEVEZ: From our perspective and, Your Honor,

16  because this was not mentioned to us that there was going to

17  be some request for discovery, I haven't gone back to sort of

18  build out what actually started I believe in December of last

19  year.

20           We did produce a significant amount of information

21  and a lot of it being business information that gives

22  financials.  The CEO testified.  This was from our perspective

23  for the most part, and I'd have to refresh my memory about the

24  beginning stages of it, was under 408.  There are some things

25  that we would --

1          THE COURT: Explicitly stated in agreement that was

2     provided pursuant to 408.

3          MS. ESTEVEZ: Right.  And I actually believe we might

4     even have an agreement.  If we don't -- I mean it's certainly

5     in the mediation context.  We agreed to mediate very early on

6     neither of us believing that it would actually resolve because

7     we were on opposite ends of the continuum, me thinking zero

8     and Bryan thinking more.

9          So I would want a chance to actually look at that

10    but I think very significantly we at least didn't find any

11    cases out of the federal courts in New York that would allow

12    an objector to come in at this stage and why that's so

13    critical is because we have Mr. Yim who's saying he's owed

14    eight or $900,000 and [inaudible] believes that he's owed

15    anything like that but he's coming in with that.  If that's

16    the case -- I mean he'd never even get $400,000 out of this.

17    To me those numbers are just crazy.  So no matter what happens

18    with this he is very likely to do exactly what he said in open

19    court when he was here last time which is I want to opt out of

20    this settlement.  If that's true he has no standing to object.

21    So the get he'd in front of not even knowing whether he's

22    going to have standing to object, he's going to get notice

23    just like everybody else and if he objects he absolutely as a

24    matter of law has no standing to object.

25          So for me the craziness of putting another lawyer in

1    to invite people to go to some other lawyer that's going to

2    redo discovery and second guess everything that's been done

3    for somebody who has been in open court said that they were

4    going to opt out of this settlement I mean for me this is all

5    very premature.

6           Mr. Yim, there was some concerns expressed about

7    getting the agreement that Mr. Yim would have because it was

8    filed under seal.  He will get that just like every other

9    class member will get that with the notice.  He'll have a long

10   opportunity to consider whether he wants to participate,

11   whether he wants to do nothing and have claims extinguished

12   and be paid for that or whether he wants to opt out.  I think

13   when someone thinks they're owed $900,000 and the maximum

14   recovery is a fraction of that, the very likelihood that he is

15   going to opt out and what I would ask is that the Court defer

16   all that until he makes that decision 45 days after notice is

17   sent.

18          THE COURT: Well, let me ask.  I don't want to put

19   you on the spot, Mr. Rand, but if you have an intention -- I

20   just don't want to speculate about this but does your client

21   plan to either opt out or object?

22          MR. RAND: I don't think there's a choice -- I don't

23   think he has to make a choice because he's not an objector.

24   He's actually a plaintiff in this action.

25          THE COURT: Yes, but he will either object to the

1   settlement or not.

2          MR. RAND: He'll object to the settlement and he'll

3   say if it's approved he'll opt out.  He's not an outside

4   person.  He's part of the case.  I would request that that be

5   provided to him.

6          THE COURT: What be provided to him?

7          MR. RAND: Everybody should be able to object and say

8   if it hasn't changed then I'll opt out.  That's only

9   reasonable in this case where one of the plaintiffs who

10   started the action.

11          THE COURT: I'm certainly not going to decide that.

12   There's no reason to decide it now.  If you choose to -- if

13   preliminary approval is granted and notice is sent out and you

14   choose to object obviously it's fair game for the others to

15   say that you can't then opt out and vice versa.  If you're

16   going to opt out you can't --

17          MR. RAND: We will have standing to object because

18   we're a party to the action.  Maybe an objector --

19          THE COURT: Mr. Rand, Mr. Rand, I do understand the

20   argument.  I'm just not in a position to resolve it right now.

21          All right.  I don't want to have my silence on -- in

22   response to your statements be construed as anything.  It's

23   not.  I don't mean to signal agreement that it's crazy to have

24   another lawyer here.  Mr. Yim is a named plaintiff.

25          MS. ESTEVEZ: No, I don't think -- I'm talking about

1  to send that out in a notice --

2          THE COURT: I see.  You're talking about the notice.

3          MS. ESTEVEZ:  -- where he doesn't have standing to

4  object.  I mean he's raised a whole bunch of things that are

5  not in his briefing which -- I've been doing this for 23

6  years.  I've never heard of that because the process is

7  there's a preliminary approval.  It's a lesser standard than

8  final approval.  If somebody doesn't like the deal and it's

9  very clear that Mr. Yim as he had said in open court is going

10  to opt out if that's what is preliminarily approved and at

11  that point he has no standing and you can't put the cart

12  before the horse and have a whole bunch of class members in

13  all coming in to try to renegotiate what they don't like about

14  the agreement or they're going to opt out.  That would make

15  the process insane because a number of people could come in

16  and try to tweak things.  If they don't want to be part of the

17  case they don't need to be part of the case.  They're not

18  bound by it in any way whatsoever and he can proceed to court.

19  He could sever himself out of this and bring a single

20  plaintiff action for $900,000 if that's what he wants to do.

21          MR. RAND: Can I make some --

22          THE COURT: Of course.

23          MR. RAND: First, Mr. Yim has told me that he does

24  not have all the documents that were produced in the case.  He

25  had represented that he had given all those documents to Mr.

1    Yim -- I don't know who's correct.  My client said he does not

2    have a disk with all the documents that were produced.

3           MR. SCHWARTZ: I didn't say that I gave him all the

4    documents that were produced in the case.  I never said that.

5    He has the -- he was referring earlier to the independent

6    contractor agreements including both the new one that Mr. Yim

7    helped -- as one of the plaintiffs that was involved in

8    mediation helped create and then also the old one that he is

9    currently bound by.  He certainly has those documents.

10          MR. RAND: The other thing I want to point out is

11   that the Saline case deals with outside contractors.  A major

12   part of this case is the underlying New York breach of

13   contract case.  They're supposed to get commissions under

14   their contracts.  The documents I put forward show that they

15   are falsifying what the invoices are to customers and rip off

16   these poor drivers by 30 percent on their commissions.  That

17   has nothing to do with being an outside contractor.  They have

18   signed agreements.  The agreement says they get their percent.

19   They're being defrauded under the agreements.  They should

20   have their day in court and they should win and it can be

21   proven by the documents in the case, some of which we've

22   showed.  We've showed the invoice to the customer and we've

23   shown the statement of what commissions.

24          Actually just recently in 2015 they're continuing to

25   do this activity.  At a minimum someone needs to put forth all

1   the documents to show that Mr. Yim is -- that that's not a

2   [inaudible] that's happening to him but there are many other

3   situations where they show the invoice to the customer that

4   show that his commission is being calculated properly.  Here,

5   in these papers knowing [inaudible] what the total amount

6   sought in the case is.  In securities class [inaudible] the

7   law has now changed and you are required to put that in the

8   notice.  Now, I know it's not required in labor settlements

9   but most labor settlements the court needs to know what the

10  full amount sought in the case is to know if the amount

11  recovered is reasonable.  Here there's no statement as to the

12  maximum amount estimated or alleged to be recovered in the

13  case.

14          THE COURT: Do you want to respond?

15          MS. ESTEVEZ: I actually do because saying that our

16  clients are ripping off people to customers.  First of all,

17  the documents that are attached, most of them say that they're

18  estimates and we actually calculated the numbers under this

19  and I think it's because he's -- the objector's counsel has

20  not actually read the contract and doesn't understand the comp

21  because all of the things he shows on these hand-helds

22  actually show that this was paid correctly.  And what he does

23  is he'll show an invoice to a customer and it's mismatched

24  with misinformation.  That doesn't tell the full story.  I

25  think it was probably an issue that Mr. Yim had because I

1  explained some of this to opposing counsel walking through

2  this but if you actually look at the documents submitted they

3  all say that they're estimates or they're invoices and what

4  happens with Carey and -- I actually tried to have a

5  conversation with objector's counsel that this wasn't

6  possible.

7          The amount that you charge to a customer -- I'm

8  sorry, the amount of the fare that's charged to a customer is

9  not the amount that the commission is based off of.  It's very

10  clear in the contracts.  It's even more clear in the new

11  contracts how that is done but if there are different

12  surcharges or a travel agent actually brings that in it is

13  very clear and completely lawful under the Pactor case, under

14  the Pactor decision out of the Second Circuit, completely

15  lawful to say and it's called a base vehicle revenue.  It's

16  not called -- and he wants commissions run off of that before

17  you take out the 20 percent discount that you have to give to

18  pay out to the travel agent.  So the numbers are completely

19  miscalculated.  So I just want to say that we strongly

20  disagree that the client was ripping off -- I mean that Carey

21  was ripping off its drivers.

22          But nevertheless what this does show is that from my

23  perspective is that Mr. Yim's claims are extraordinarily

24  individualized if he's looking at his own documents and saying

25  that he was ripped off and they gave explicit examples of a

1  whole list of them and here's where there was a problem. I

2  mean that's a very individualized thing to Mr. Yim. I think

3  as well as he's saying he's giving kickbacks to people. All

4  of the things in here are all the reasons that he probably

5  will opt out in which case he would not have standing to

6  object.

7         THE COURT: Mr. Schwartz, do you want to be heard?

8         MR. SCHWARTZ: Yes, Your Honor. So a few things. On

9  the various claims being asserted that the alleged contract

10  violations, I mean one of the things that's important about

11  the settlement is -- and one of the things we spent a lot of

12  time negotiating was greater transparency in the new

13  independent operator agreement on that exact point so it's

14  much clearer. Unfortunately under the old contract the

15  language is so, from my perspective tilted toward the company

16  that they could -- it says there's a provision in here the

17  adjusted gross revenue is equal to the verified gross charges

18  less tips, sales and use tax. There's commissions, fees,

19  system service charges, tools, parking expenses, telephone

20  charges. It's a lot of stuff that the company can sort of

21  interpret and make a lot of deductions.

22         It doesn't give a very strong basis for a contract

23  claim but it does show -- it is one of the things that my

24  clients were very concerned about which is why one of the

25  major things we negotiated was a lot more transparency and a

1  provision that the company cannot add -- cannot take away from

2  fares after the drivers agree.  The driver knows --

3          THE COURT: After the driver?

4          MR. SCHWARTZ: Has agreed to -- so the driver agrees

5  to run to the airport and pick somebody up.  Before now,

6  unlike before, if they take the new deal before they got out

7  there they will know exactly what the deductions are going to

8  be so what they're going to get paid which is different than

9  before and much superior.  If they're really independent

10 contractors they're bargaining and they should know what the

11 job is worth to them.  That's one thing, Your Honor.

12         I do want to say though as far as the valuation of

13 the claims issue, this idea that we didn't provide information

14 on that I think a) we did and b) as Your Honor pointed out the

15 case law does not support this idea that there's a set

16 percentage of the overall claim value that is required in a

17 class case -- in a class resolution.  We cited in the papers

18 the Morris decision where they got about two percent.  We

19 cited the Davis v. JP Morgan Chase case where the court

20 explicitly held it's important to bear in mind it will often

21 be difficult if not impossible to calculate with precision or

22 accuracy what the best possible recovery would be at trial and

23 that's why you don't have to say what -- exactly what that

24 number is.

25         Nonetheless, we came to the conclusion that we were

1   covering a substantial and meaningful recovery, more than ten

2   percent of what we thought a reasonable full relief of the

3   total claims value is which frankly is an exceptional recovery

4   even financially based on the Saline case sitting out there,

5   based on other results where people are getting a much smaller

6   fraction.

7            THE COURT: I just want to be sure I understood what

8   you're saying when you refer to full recovery.  Are you

9   talking about assuming you were overpaid in all obstacles then

10  by Saline and concerns about certifying a class in arbitration

11  and actually got a verdict in your favor on all claims.

12  You're saying that the damages you'd be able to prove would be

13  about ten times the amount you're getting here or are you

14  saying something else?

15           MR. SCHWARTZ: No, I think it came across that way.

16  I think the full relief number again factoring in imprecisions

17  like the Davis v. JP Morgan Chase acknowledges they're always

18  present.  It includes risk factors like the fact that if

19  somebody signed a release and has an arbitration agreement and

20  whatever that their overall likelihood of recovery is not 100

21  percent or anywhere close to it.  So the full relief number is

22  if we -- it factors in that they -- and we will spell this out

23  more at final approval but the risk factors are factored in to

24  the full relief.

25           THE COURT: I guess I'm trying to understand.  It

1  sounds like you're -- and I may be misunderstanding what

2  you're saying but it's coming across as if you're factoring it

3  in twice.  Once as a basis for approval -- saying we should be

4  allowed to have something that is less than full value but

5  also in determining what full value would be you're baking

6  into it concerns about arbitration and the like that would

7  reduce it from a much higher number that would be if you were

8  simply to prevail on all of your claims.

9          MR. SCHWARTZ: I think that to some degree that's

10  true.  I want to see where -- I know we talked about this.

11          THE COURT: I want to be clear.  I think this is an

12  issue that doesn't preclude preliminary approval and notice

13  but it does have to be hashed out at the final approval stage.

14          MR. SCHWARTZ: I appreciate that, Your Honor.  I

15  think what this is making clear to me and I'm going to make a

16  note of it is like I want to really spell this out more at the

17  final approval.

18          MS. ESTEVEZ: Your Honor, one other thing to factor

19  in and Bryan made this very clear to me in a lot of our

20  discussions.  The changing of this agreement was very

21  significant.  You're literally taking something that's been in

22  place for many, many years and improving it significantly and

23  it doesn't only just improve language and rights but I just --

24  and you have this, Your Honor, and I refer you to what we've

25  attached as -- called the Bill of Rights and right in there

1    you'll see ten things built in.

2              THE COURT: Yes, please give me a moment to find it.

3              MS. ESTEVEZ: Sure.

4                        [Pause in proceedings.]

5              MS. LISITZKY:  It's Document No. 57-2.  So it's an

6    attachment to the joint stipulation.

7              THE COURT: The proposed final order?

8              MS. ESTEVEZ: It's Exhibit F filed 9/25/15.

9              THE COURT: What page is it on, 107?

10             MS. ESTEVEZ: It's Page 77 of 107.  That's the

11   exhibit and then you can turn --

12             MS. LISITZKY: It's Exhibit F to the joint

13   stipulation and settlement agreement which in turn is an

14   attachment to the notice --

15             THE COURT: I don't know that I have that here.  Do

16   you have an extra copy that I can take a look at while you're

17   discussing it?

18                        [Pause in proceedings.]

19             MS. ESTEVEZ: Yes, Your Honor, I'll give that to you.

20             But this is effectively -- there's ten things listed

21   here and we'll hand it up to you but these are the kinds of

22   things that were -- these are actually just examples of things

23   that were baked into the agreement.  For example, that they're

24   non exclusive -- they're not exclusive to Carey.  They can

25   work for others.  They're allowed to hire employees.  So some

32

1  of them, I believe including Mr. Yim, have had drivers from

2  time to time basically do all their runs.  They can turn down

3  as much work as they want.  They can take vacation for three

4  months, six months, nine months.  They can just not even show

5  up the whole entire year and never take a job if they don't

6  want to.  They pick their own schedules.  They decide their

7  own method of operations.  There's very, very little put on

8  them and the value of that type of injunctive relief which is

9  total and absolute freedom to do what you want, run your

10 business like you want, delegate what you want, these are

11 things that are all baked into this new agreement which had

12 significant value and there's a whole host of cases, a lot of

13 them coming out of securities which I'm sure objector's

14 counsel is familiar with where that has a value as well.

15         Again, I'm sure that Mr. Schwartz will lay that out

16 more at final approval but it is a very significant and

17 material thing that actually the class members had a choice to

18 take or not take and they can still collect what they want.

19 As Mr. Schwartz had said, there are a number of people who

20 when you enter a new agreement with Carey they generally get

21 releases, releases that are valid under New York law, releases

22 which we produced multiple examples of to Mr. Schwartz which

23 would waive all of their New York claims.  There are a lot of

24 factors that had to go in here.  I mean literally I think for

25 15 hours one day we sat in our offices and I walked Bryan

1  through like how that would affect value.  If this is a good

2  agreement, if this is a good release and you can't do anything

3  about it he can deduction claims all over the place under New

4  York law.  He can say six years under New York law but the

5  bottom line is that that release is valid and I win and you

6  can't show me a case that says I won't win, the value goes

7  down significantly.  So it was a number of factors like that

8  that were taken into account where we finally -- I mean and a

9  bit contentiously reached what we reached in terms of an

10  agreement.

11          MR. RAND: On the valuing --

12          THE COURT: Wait, wait.

13          MR. RAND: I'm sorry, Your Honor.

14          THE COURT:  I want to give Mr. Rand a chance but

15  also just thank you for giving me the Bill of Rights.  I had

16  looked at that particular document before but they didn't

17  summarize -- at least the salient portions of it are

18  summarized in the, I believe in the memorandum supporting the

19  preliminary approval.

20          Mr. Rand, I know you'd -- I'd like to start before I

21  lose track of the question.  Your client is dissatisfied with

22  the amount of recovery.  I get that and I understand the gap

23  that you see between -- the very large gap between what he

24  gets monetarily and what he thinks he's entitled to but I

25  don't think you've addressed squarely what value if any your

1   client sees to the change in the contract.

2           MR. RAND: The change in the contract would require

3   him -- he doesn't want to change the contract, first of all.

4   He's happy with his contract.  He has an unlimited contract.

5   The new contract would require an arbitration provision which

6   I don't know if you saw the article in the *New York Times*

7   Sunday edition two weeks ago.

8           THE COURT: Well, I'm not going to decide anything

9   based on [inaudible].

10          MR. RAND: I mean there's a long case law that

11  says -- basically the article says when you have an

12  arbitration agreement where you have to pay for the cost of

13  arbitration you cannot challenge small damages that are done

14  to you.  And it's here --

15          THE COURT: I'm very familiar with the concerns about

16  arbitration.

17          MR. RAND: Well, if Mr. Schwartz -- as Mr. Schwartz

18  has admitted here, he says the people who have arbitration

19  agreements have lesser value of their claims than people that

20  don't.  So now the people in this class are being forced to

21  sign an arbitration agreement which will lower their ability

22  that -- the value and merit of their future claims.

23          THE COURT: It lowers the value of claims that you

24  might bring -- otherwise bring in court but I -- I guess one

25  of the things that I would have to think about is does the

1  reformed contract provide a greater value --

2            MR. RAND: I'm sorry?

3            THE COURT: Does the reformed contract provide

4  greater value and greater rights to drivers so that they

5  wouldn't be in a position of having to bring claims and that

6  they're better off if the contract is enforced?

7            MR. RAND: Most of the provisions in the Bill of

8  Rights are designed to demonstrate that they're outside

9  contractors so they can never make the argument again that

10 they're not -- that they're [inaudible] employees and all

11 those terms are the definitions needed to define someone as an

12 outside contractor.  There may be some benefits.  I haven't

13 studied it in detail and that's really what's going on there

14 if you look at it on case value.  Finally, the --

15           THE COURT: So wait.  It's because -- because it

16 makes clear that they are independent contractors that's a bad

17 thing.

18           MR. RAND: Well, they only work for one company and

19 they're only going to work for one company.

20           THE COURT: I'm talking about your client.  Forget

21 they.

22           MR. RAND: It's about them.  They would like to be

23 employed because they only work for one company.  It's very

24 hard to work for more companies.  How many radios are you

25 going to have in your car, you're going to get conflicting

1  signals.  That's not how the business works and so my

2  client --

3           THE COURT: How does Uber work?

4           MR. RAND: My client has been complaining that they

5  won't be given enough work.

6           THE COURT: How does Uber work?  Don't those drivers

7  work for multiple services?

8           MS. ESTEVEZ: Including Carey.

9           MR. RAND: They work for Uber.

10           THE COURT: But don't they also take jobs for other

11  companies?

12           MR. RAND: I don't think so.

13           THE COURT: That's contrary to my understanding but

14  that's not --

15           MR. RAND: My client has not worked for other

16  companies and he wants to work for this company as much as

17  possible I believe.  He was working 72 and a half hours.

18  That's what he was doing for many years.  I don't believe he

19  was working for other companies.

20           Can I make one --

21           THE COURT: Yes, of course.

22           MR. RAND: The release in this proposed agreement is

23  a blanket release that comes right up to the date of today

24  with the date the agreement is signed and I don't see anything

25  indicating where the calculation of damages is that ends on

1  the end date of the release because however they negotiate it,

2  let's say it's all fair, right, and usually you have a

3  spreadsheet and you say how much the people are owed, you say

4  I'll take a 95 percent discount, this will be the settlement.

5  But the release shouldn't release claims after the settlement

6  calculation period ends.  Since I don't know when their

7  settlement calculations period ended and I see -- my client

8  showed me that just recently he seems to be suffering damage.

9  It seems to be reasonable if their calculations end at the end

10 of 2014 the release should end at the end of 2014 so that

11 [inaudible] the calculations covering the later period.

12          THE COURT: That strikes me as [inaudible].  This

13 isn't the first settlement that I've seen and my experience

14 and I may be wrong about this is that typically the release

15 will go up to the date of the approval of the settlement and

16 as a practical matter because you don't know when it's going

17 to be you can't put the notice how -- exactly what the damages

18 will be on that date.  So this can't be the first time this

19 has come up, can it?

20          MR. SCHWARTZ: Your Honor, it goes to preliminary

21 approval and in my experience it always goes to either

22 preliminary approval or final approval.  I always negotiate

23 for it to go to only preliminary approval.

24          THE COURT: Well, one or the other.

25          MR. SCHWARTZ: Yes.  Your Honor, just to address a

1   few of those other things because there were a number of

2   misstatements in there that are I think important to address.

3            It is simply not the case that most of the drivers

4   a) want to be employees or b) only want to work for Carey.

5   That is not a factual assertion.  The drivers -- and I've had

6   other driver cases where that was true so I know the

7   difference.  These drivers want to be their own business

8   people but under the old contract they were restricted from

9   doing so and prohibited from doing jobs for other -- they

10  could be fired.  They could lose their contract altogether if

11  they did work for -- in fact, the contract that Mr. Yim has

12  now he could be let go at any minute if he does work for other

13  people.

14           THE COURT: But in fairness the theory under the

15  complaint that you've been litigating or you're prepared to

16  litigate if settlement isn't approved, is that the drivers are

17  employees.

18           MR. SCHWARTZ: That they were being treated like

19  employees -- that they had the worst of all worlds was our

20  theory.

21           THE COURT: But that for purposes of the FLSA they're

22  employees.

23           MR. SCHWARTZ: That they have been treated as

24  employees because their agreement exercised control.  That's

25  not to suggest that they want to be employees.  They don't

1  want to be restricted like employees.  They want to be actual

2  independent contractors and have that kind of independence.

3          THE COURT: But to the extent -- to the extent that

4  in the absence of a settlement you would be litigating these

5  claims your theory would be that they are entitled to the

6  benefits and protections accorded under the FLSA to --

7          MR. SCHWARTZ: Looking back.

8          THE COURT: Yes, looking back to employees.

9          MR. SCHWARTZ: Right.  But we're changing -- it's the

10 difference -- the two -- we're talking about two different

11 time periods.  One is looking back and under Mr. Yim's old

12 agreement on paper at least we felt we had a strong argument

13 that the agreement made him seem like an employee because of

14 the extent of the control under the Brock factors.  But that

15 going forward the agreement will make very clear that they

16 really are genuinely, not nominally, not superficially, not to

17 avoid liability but genuinely independent.  They can turn down

18 work.  They can work for other companies.  They can sell the

19 business which is extremely valuable to them.  I realize --

20 this was something we negotiated we hard for that the company

21 was not thrilled about.

22          But they can -- they're now going to have a ten-year

23 contract that they can go sell and it's a valuable -- I won't

24 say franchise.  It's the wrong word but it's a valuable

25 enterprise.

1          THE COURT: What is it exactly that he's selling?

2          MR. SCHWARTZ: They sell the IO agreement.  They sell

3     the agreement.

4          THE COURT: So, in other words, Driver A has an

5     agreement, a ten year contract to provide services as an

6     independent contractor to Carey and A can unilaterally sell

7     that contract to B and B steps into the shoes of A.

8          MR. SCHWARTZ: Correct.

9          THE COURT: Okay.

10         MS. ESTEVEZ: Mr. Yim bought his contract.

11         MR. SCHWARTZ: I think all of my clients bought their

12    contracts from other drivers originally.

13         Now, here's the big difference though.  Under the

14    old agreement Carey had unilateral approval or disapproval of

15    a sale like they could just say no.  They had a right of a

16    first refusal and the old contract said you could not sell the

17    franchise or whatever, the enterprise, for more than you

18    bought it for which was a good argument for why they were

19    employees because they couldn't profit or loss on it.  Now

20    they could sell it for any amount of money and it is valuable.

21         THE COURT: Is there any right of refusal or --

22         MR. SCHWARTZ: Only if somebody's not --

23         MS. ESTEVEZ: Not if you don't have a chauffeur's

24    license or you're --

25         THE COURT: If somebody is qualified to hold a

1   position --

2           MR. SCHWARTZ: If somebody is qualified they cannot

3   withhold it.

4           MS. ESTEVEZ: Right.

5           MR. SCHWARTZ:  So it's a very big difference for

6   them.

7           THE COURT: Is there -- other than reviewing

8   qualifications is there any right of review?

9           MR. SCHWARTZ: I think it's for -- like if you had a

10  criminal -- like if you had a drunk driving convictions.

11          THE COURT: Right.  I guess what I'm trying to see is

12  even if there's not a right of refusal or if there's not a

13  veto other than for qualifications are there procedures built

14  in that would give Carey the ability to essentially slow it

15  down to a stop?

16          MR. SCHWARTZ: No, not the same -- they used to, yes.

17  The old agreement clearly.

18          THE COURT: I'm talking about under the new

19  agreement.

20          MR. SCHWARTZ:  The new agreement is -- we could --

21  anyway -- I haven't -- I wanted to make another point as well

22  while we're trying to find that for you.

23          THE COURT: Mr. Rand, go ahead.  Go ahead finish and

24  then Mr. Rand.

25          MR. SCHWARTZ: Okay.  So we'll address that point but

1   it's pretty nominal at this point.  But another point that he

2   makes though is about arbitration.  Now I'm no big fan of

3   arbitration generally speaking.  But the biggest reason that

4   I'm not a fan of arbitration is because of class waivers and

5   they are going to be citing an arbitration provision.  Carey's

6   bearing all the costs of it.  Here's the thing.  Because the

7   business model is changing so dramatically there aren't going

8   to be class claims in -- it's almost impossible to conceive of

9   a class claim that could arise under the new business system

10  because they have so much freedom.  So if somebody has a

11  dispute where they say Carey took some money or whatever but

12  it's not going to be a class issue the way that -- under the

13  old contracts it could be because there were contract

14  provisions.

15          THE COURT: Well, unless somebody in Mr. Yim's

16  position for example who -- other than the fact that Mr. Yim

17  wants the old contract but somebody who feels as Mr. Yim does

18  who has the new contract might want to assert that despite

19  your best efforts the drivers remained employees and would

20  want to assert a new class and they would be precluded from

21  doing so.

22          MR. SCHWARTZ: They would but -- and so that was

23  certainly a compromise that when we were getting a lot of

24  other benefits for the drivers we had to make some

25  compromises.  I would have loved to get more money.

1          THE COURT: So the argument essentially is that

2    whatever the equals of compelled arbitration are you've

3    ameliorated it by front loading relief that would obviate the

4    later need to assert claims that wouldn't be able to go

5    forward in court.

6          MR. SCHWARTZ: I think the advantages of the new

7    agreement far, far outweigh it and the arbitration -- it's

8    very difficult for me to imagine a situation where a class

9    claim could arise under the new agreement.  So that they're

10   not really giving much up there.

11         THE COURT: Mr. Rand has been waiting patiently.  Go

12   ahead, sir.

13         MR. RAND: I just had one point that if someone was

14   going to buy one of these contracts they would purely talk to

15   the company and make sure the company was okay with them

16   buying it.  They would never buy it without ever talking to

17   the company and if the company said they're were unhappy will

18   you as a driver go buy a franchise.  I actually did a case

19   when I was working at a big firm as a pro bono attorney for

20   again Idle Two Way radio and all these people had bought these

21   contracts and they were diluted and there were too many

22   contracts and they didn't get any money.  So I think most

23   people if they're paying real money are going to ask the

24   company is this a good thing, are you happy with me.  Now, the

25   company will probably lie and say yes and screw them anyway

44

1  but they certainly wouldn't buy it if the company said they

2  didn't like them.

3         THE COURT: Why do you say that?

4         MR. RAND: Huh?

5         THE COURT: Why do you say that the company would lie

6  and screw them anyway?

7         MR. RAND: Because they're not lie and interfere but

8  it's --

9         THE COURT: Look, you --

10        MR. RAND: I don't know.  I'm just saying.

11        THE COURT: Whoa.  Let me get the question out.

12  You're positing a situation where the company in your words

13  would lie and screw them anyway but --

14        MR. RAND: Because I'm saying it's about the --

15        THE COURT: I wish very much you would let me finish

16  the question.  If you're not willing to do that I won't ask it

17  but that's fine.

18        MR. RAND: I apologize.

19        THE COURT: What is leading you to assume that

20  somebody who comes to them who is otherwise unknown to Carey

21  is going to be somebody that Carey has a motivation to treat

22  poorly as opposed to bringing them on and having them replace

23  the valued driver with somebody who's equally productive for

24  them?

25        MR. RAND: Because right now the company has to

1  consent to a transfer.  So therefore if the company doesn't
2  like the driver they won't consent.
3          THE COURT: Yes, but why won't they like the driver?
4          MR. RAND: I don't know.  I don't think they would.
5  I don't think it's meaningful at all.  I think it's not a
6  meaningful part of the settlement but they're making this
7  point.
8          THE COURT: Okay.
9          MR. RAND: And my point is that it doesn't really
10 matter if they consent or don't consent if they have a right
11 to consent or not consent because nobody would buy these
12 without talking to the franchise and at least having the
13 franchise tell them it's okay for you to buy it and we like
14 you.
15         THE COURT: Anything else anybody wants to say?
16         MS. ESTEVEZ: Just, Your Honor, that in everything
17 that he just said regarding Carey holding people up or
18 screwing them or any of that is just false.  Again, under the
19 agreement the independent operator has the right to sell,
20 lease or assign its rights under the agreement and what their
21 obligation are is to make sure that the drivers have the very
22 basic licenses, permits and qualifications to be a chauffeured
23 driver.  That's it.
24         And on top of that the other language that was
25 negotiated is that any proposed ownership is going to be -- is

1    reported to the company and that the company shall approve of

2    such change promptly and not withhold approval except on good

3    cause shown and are based on the terms identified herein.

4              The other thing that the drivers have to do is agree

5    to abide by the agreement that they're actually taking over.

6              One other thing that was raised is that I think --

7    and I'd really love if Your Honor could get him to tell us

8    where he got that more than half or half of the drivers do not

9    have arbitration agreements.  In fact, right before Mr.

10   Schwartz stepped into this case Carey self converted to

11   several drivers for $2,000 release of which is all factored

12   in, these drivers to independent operating agreements which

13   Mr. Schwartz came in and actually modified more in the ways

14   that we've talked about and they all signed off because they

15   do want to be independent operators.

16             Carey, and I'm representing as an officer of the

17   Court, has multiple drivers that have more than one spot that

18   have other people drive for them and that drive for other

19   companies that own their own companies.  In fact, I would say

20   a large percentage of Carey actually have their own companies

21   that they're actually chauffeured.  Some of them have more

22   than one car and again some of them have their own employees

23   or their own contractors.

24             One other issue that he raised is that the cost of

25   arbitration is a big problem for these people.  Another thing

47

1  that was negotiated in this agreement is that the cost of

2  arbitration for these independent operators will be no more

3  than the cost of filing in court.  Everything else is paid by

4  Carey.  So there is nothing that makes arbitration an obstacle

5  here.  Again, these are just misrepresentations that I'm not

6  sure where they come from.

7              THE COURT: In terms of the number of drivers who

8  are -- who have these arbitration clauses, I remember seeing

9  the motion papers, the -- in support of the conditional

10 settlement -- conditional approval rather.  A number of --

11 upwards of 200 members of the class.

12             MR. SCHWARTZ: It's a very high number.

13             MS. ESTEVEZ: It is the vast majority, Your Honor,

14 and it --

15             THE COURT: Mr. Rand, where are you getting a

16 different --

17             MS. ESTEVEZ: He said 100.  He said 100.

18             MR. RAND: It's my recollection from reading the

19 hundreds of pages in support of this preliminary approval and

20 they put in numbers and that is my recollection.  I was not

21 quoting exact numbers.

22             THE COURT: Okay.

23             MR. RAND: But it could be in the papers.  They say

24 how many people were in the class and how many people have --

25             THE COURT: Well, they've given me that

1  representation in the memorandum in support of the declaration

2  and I take it you're not saying it's false.

3            MR. SCHWARTZ: No.

4            THE COURT: All right.

5            MR. SCHWARTZ: I'm not saying it's true either.  I

6  just --

7            THE COURT: But you don't have a basis for saying

8  it's false.

9            MR. SCHWARTZ: Correct.

10            THE COURT: Well -- all right.  So to the extent that

11  you are assuming that it's a higher number it seems to be

12  speculation.

13            MS. ESTEVEZ: It's over 200, Your Honor.

14            THE COURT: Can you just give me the [inaudible] if

15  you have that.

16            MS. LISITSKY:  That is Page 19 on Document 57 and it

17  cites to Bryan Schwartz's declaration.

18            MR. SCHWARTZ: We had all the -- Your Honor, this

19  came from -- we had all the -- copies of all the agreements.

20  So we knew how many people were in each bucket and how many --

21  you know, all of the newer agreements that have been rolled

22  out have arbitration clauses in them.

23            THE COURT: Well, taking into account everything I've

24  read and the parties submissions and that I've heard today I'm

25  going to recommend that the Court give preliminary approval to

49

the class.  I think the requirements of numerosity and

typicality and adequacy and predominance are all easily

satisfied here and the settlement is based on my initial

evaluation of the fairness is -- strikes me as within the

range of possible approval and I would say no more than that

pending litigation of final approval.

        So I'm going to recommend to Judge Kuntz -- I should

say because I raised this earlier that with respect to

conflict I'm satisfied based on the submissions from counsel

that for purposes of litigating these proposed settlement

approval there's not [inaudible] conflict of interest and that

the attorney's fees are properly best to consider in

connection with final approval subject only to the fact that

obviously the fee provision is part of post settlement and I

need to say no more than that as well as the rest of the

proposed settlement is within the range of permissible

settlement agreements.

        I don't find any problem with the proposed notice.

So I'm going to recommend to Judge Kuntz that he give

preliminary approval and approve sending out the notice

without prejudice to the submission of a proposal by Mr. Yim's

counsel for consideration of a supplemental notice that sets

forth his views.  I don't want to give any preview of how I

might come out on that because I want to see the proposed

notice and the parties arguments on whether or not it should

1  go out and I think the proposed notice as is is a self

2  contained notice that can and properly should go out.

3          With respect to discovery, I'm not going to decide

4  that now.  I want you all to confer about that but if the only

5  discovery that's been provided has been provided pursuant to

6  Rule 408 I'm not sure that whoever has it could use it in any

7  event in the approval process but I'm going to leave it to you

8  guys in the first instance to work out whatever you can and if

9  there's a dispute you'll bring it to me.

10         I'm going to consult with Judge Kuntz to see if he

11  prefers something more formal in writing to document the

12  reasons for my recommendations.  If he doesn't think that's

13  necessary I'm just going to enter a report and recommendation

14  based on the transcript of today's proceeding.

15         Is there anything else for today, folks?

16         MR. SCHWARTZ: Your Honor, shall we set a date for a

17  final approval hearing?

18         THE COURT: I don't -- no, only because I can't rant

19  preliminary approval.

20         MR. SCHWARTZ: I understand.

21         THE COURT: And part of it is granting preliminary

22  certification of the class, the settlement class and I can't

23  do that.  So it would really depend on Judge Kuntz accepting

24  the recommendation.

25         MR. SCHWARTZ: Yes, I just didn't know if that was

51

1  part of the recommendation I guess.

2           THE COURT: Right.  And of course since it is a

3  recommendation -- right now the 14 day clock doesn't start to

4  run because -- and it won't until I enter a report and

5  recommendation on the docket.  I'm going to defer doing that

6  until I've spoken with Judge Kuntz to see if he prefers

7  relying on the transcript of today's proceeding or he wants a

8  written document.  But once one of those are on docket then

9  there will be a 14 day period in which anyone objecting to the

10 recommendation can lodge those objections.

11          All right.  Anything else for today, folks?

12          MR. RAND:  Nothing.

13          MR. SCHWARTZ:  No, Your Honor.  Thank you.

14          THE COURT: Have a very good day.

15 (Proceedings concluded at 12:34 p.m.)

16                           *  *  *  *  *

17

18

19

20

21

22

23

24

25

1        I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5   _____

6                    Shari Riemer, CET-805

7   Dated:  December 9, 2015